JOSEPH A. GARCIA, A MINOR BY HIS NEXT FRIEND, HIS FATHER, DENNIS GARCIA et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Garcia v. Commissioner
Docket Nos. 11696-78, 11697-78, 11698-78, 11699-78, 11700-78, 11701-78, 11815-80, 12046-80, 12187-80, 12188-80, 12189-80, 12190-80, 12407-80.
United States Tax Court
T.C. Memo 1984-340; 1984 Tax Ct. Memo LEXIS 335; 48 T.C.M. (CCH) 425; T.C.M. (RIA) 840340; July 3, 1984. Michael J. Abramovitz, for the petitioners. William P. Hardeman, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax under sections 6651(a) and 6653(b) [2] in these cases as follows: Docket
Addition to Tax
No.
Petitioner
Year
Deficiency
Sec. 6651(a)
Sec. 6653(b)
11815-80
Dennis and
1968
$2,252
Eliza L.
1971
18,512
9,256.00
Garcia
1972
32,201
16,100.50
1973
35,561
17,780.50
11696-78
Joseph A.
1971
$2,115
$423.00
12407-80
Garcia
1973
2,361
11697-78
Patricia M.
1971
$2,115
$423.00
12190-80
Garcia
1973
2,363
11698-78
Michael J.
1971
$1,906
$381.20
12187-80
Garcia
1973
2,137
11699-78
Carla Y.
1971
$2,115
$423.00
12188-80
Garcia
1973
2,362
11700-78
Dennis R.
1971
$2,115
$423.00
12046-80
Garcia
1973
2,362
11701-78
Imelda E.
1971
$2,115
$423.00
12189-80
Garcia
1973
2,362
*338 All of these deficiency determinations (except the one for 1968 and certain mechanical computation changes) are attributable to adjustments to the income of a partnership, Den-Gar Enterprises. Dennis and Eliza L. Garcia reported 25 percent of the stated gains and losses of the partnership, and their six children each reported 12-1/2 percent. In addition to increasing the profit of the partnership for each year, respondent determined that the partnership had no substance and that its entire profit was taxable to Dennis and Eliza L. Garcia (docket No. 11815-80). Alternatively, respondent determined that, if the partnership agreement is valid, its income as revised upward is distributable in accordance with the partnership agreement, 25 percent to Dennis and Eliza L. Garcia (docket No. 11815-80) and 12-1/2 percent to each of their six children who are petitioners in the other dockets listed above. The deficiency determined in the case of Dennis and Eliza L. Garcia for 1968 *339 is based on the disallowance of the carryback of a net operating loss reported for 1971 and will be resolved automatically along with the question of the 1971 deficiency. In the case of Dennis and Eliza Garcia (docket No. 11815-80), the bar of the statute of limitations for 1971 and 1972 is lifted only if their returns for those years were fraudulent within the meaning of section 6501(c)(1); as to 1973, the bar may be lifted on that ground as well as on the ground that the return omitted an amount properly includable therein which is in excess of 25 percent of the amount of gross income stated in the return within the meaning of section 6501(e)(1)(A). In the case of each of the six children, the notice of deficiency for 1971 and 1973 was timely only if the amount of omitted gross income meets the section 6501(e)(1)(A) requirements. The issues for decision are: 1. Whether the statute of limitations has run with respect to the years in question. The resolution of this issue will involve several subissues, including: (a) Whether petitioner Dennis Garcia's returns for 1971, 1972, and 1973 were fraudulent within the meaning of section 6501(c)(1); (b) whether the Den-Gar partnership *340 was valid for Federal income tax purposes; and (c) whether the partnership's gross income for 1971 and 1973, and, consequently, the gross incomes of the petitioner/partners were understated by substantial amounts within the meaning of section 6501(e)(1)(A); 2. Whether respondent's reconstruction of the income of the Den-Gar partnership was correct; and 3. Whether the additions to tax under sections 6651(a) and 6653(b) determined by respondent should be sustained. FINDINGS OF FACT Petitioners Dennis and Eliza L. Garcia (Dennis and Eliza) timely filed a joint Federal income tax return for 1971 with the District Director, Albuquerque, New Mexico. For 1972 and 1973, they filed timely joint returns with the Austin Service Center, Austin, Texas. The remaining petitioners also filed timely Federal income tax returns for 1971 through 1973. In addition, timely U.S. Partnership Returns of Income, Forms 1065, were filed for 1971 through 1973 for Den-Gar Enterprises (Den-Gar), a partnership discussed below. All petitioners resided in El Rito, New Mexico, at the time the petitions in their respective cases were filed. During 1970, Dennis made substantial gifts to Eliza as custodian *341 for each of their six children and properly filed Federal gift tax returns. As of January 1, 1971, Den-Gar was created pursuant to a limited partnership agreement. Under the terms of the agreement, executed by Dennis, as general partner, and by Eliza, as custodian for each of the six children, whose names are listed in the foregoing list of dockets and deficiency determinations, the partnership was to continue for 10 years, until December 31, 1980, and from year to year thereafter. Dennis was to be the sole general partner and was to have management responsibilities. Eliza, as custodian, was to be a limited partner on behalf of each of the children. The profits and losses were to be distributed, 25 percent to Dennis and 12-1/2 percent to each child; Dennis was to receive $500 per month as reasonable compensation for his services; and he was to manage all of the affairs of the partnership. The agreement attached a schedule showing capital accounts as of January 1, 1971, of $284,509.15 for Dennis and $118,086.14 for each of the children. The contributions to capital by Dennis and by Eliza on behalf of the children comprised 32 separate items, including cash of $5,000, receivables *342 under various notes and contracts totaling over $275,000, inventory of over $14,000, stock of over $580,000, land of over $98,000, and improvements and other depreciable assets of over $112,000. Liabilities of over $88,000 were also transferred. The contributions on behalf of the children were made by using the property which had been transferred to them by the aforesaid gifts. The partnership agreement placed the following restrictions on the rights of the limited partners: 10. Limitation on Rights of Limited Partners: No limited partner shall have the right to participate in the management or conduct of the business of the partnership. No limited partner shall have the right to demand and receive any money or property from the partnership except as provided by this agreement. The general partner shall distribute the interest of each limited partner to him upon the termination of the partnership; however, no such distribution shall be made unless all liabilities of the partnership have been paid or unless the partnership has liquid assets sufficient to pay them. No limited partner shall have the right to demand and receive property other than cash in return for his contribution. *343 In addition, the rights of all partners to sell their partnership interests were restricted as follows: 12. Assignment of Partner's Interest: No partner shall sell, assign or otherwise transfer his share of the partnership to any other person or firm so as to constitute the transferee a substituted partner in the firm. If any partner desires to sell or transfer his interest in the partnership to one who is not then a partner, he shall first make written offer to sell or transfer such interest to the partnership upon the same terms and conditions for a period of 30 days. The partnership reported the following amounts of income or loss during the years in issue: 1971
($41,387)
1972
$26,836 1973
$24,928 These amounts were passed through to the partners in accordance with the percentages set forth in the partnership agreement. The actual cash distributions to the partners were as follows: 1971
1972
1973
Dennis
$761
$61,591
$28,539
Children: Dennis R.
241
771
Carla
169
771
Joseph
179
771
Patricia
84
771
Imelda
158
763
Michael
771
Total
$1,592
$61,591
$33,157
The partners' capital *344 accounts were adjusted to reflect these distributions. The following table shows the capital accounts of Dennis and each of the six children as of the close of 1971, 1972, and 1973 as reported on the partnership returns for those years: [1] 1971
1972
1973
Dennis
$325,050
$254,615
$231,930
Children: Dennis R.
105,229
112,473
114,831
Carla
105,301
112,545
114,903
Joseph
105,291
112,535
114,893
Patrick
106,386
113,630
115,988
Imelda
105,312
112,555
114,921
Michael
103,517
109,451
111,809
The principal business activity of the partnership was the operation of a store called the El Llano Store which sold groceries, hardware, clothing, and building materials. Den-Gar also owned rental properties and liquor licenses, operated a farm and small loan business, and had certain investments. The formation of the partnership made little or no difference in the day-to-day operation of the business and the management of the assets that had been transferred to it. Dennis was the controlling figure, both before and after the partnership *345 was formed. Eliza did not possess an understanding of the business commensurate with her responsibility as custodian of the childrens' interests, and she did not exercise any significant oversight over Dennis' decisions. She stated frankly at trial that she did not "know the business" and that she was "mostly a housewife." Den-Gar's accounting system was set up with the aid of Ralph Youngberg (Youngberg), a certified public accountant. Two bank accounts were set up, one for the store and one for the other properties. As Youngberg testified: Essentially * * * there was a single entry ledger that represented the store's transactions * * * and then we used the store book as a source document to create a general ledger * * * or a double entry set of books. In addition to translating petitioner's single-entry records into double-entry records, Youngberg's firm prepared Den-Gar's tax returns and petitioners' personal returns for the years in issue. Youngberg estimated that his office billed petitioners for about 100 hours of work annually. In preparing returns, Youngberg essentially relied on information supplied by Dennis, although he also did some independent checking to verify *346 the correctness of that information. The following table shows the sources of Den-Gar's income as reported on its partnership returns for the 3 years in controversy: 1971
1972
1973
Rents
$16,083 $17,781 $10,448 Gross Profits from Sales
8,056 6,325 2,447 Interest
20,854 32,578 28,518 Nonqualified Dividend
226 Farm
(5,274)
(2,013)
(7,745)
Using the bank deposits method of income reconstruction, supplemented by other adjustments, respondent redetermined Den-Gar's income for 1971, 1972, and 1973. The following table summarizes Den-Gar's income as reconstructed: 1971
1972
1973
Bank deposits
$137,335.15 $167,865.32 $135,325.59 Currency expenditures
114,159.11 52,066.88 65,380.58 Second and third-party
check expenditures
32,615.67 88,953.99 82,334.21 Total deposits, currency
expenditures & second
& third-party check
expenditures
$284,109.93 308,886.19 $283,040.38 Less nonincome items
and deposits
(94,318.75)
(117,629.16)
(71,311.10)
Net amounts of receipts
$189,791.18 $191,257.03 $211,729.28 Less: Cost of goods sold
(61,481.00)
(51,703.00)
(61,607.16)
Operating expenses
(101,149.00)
(49,230.00)
(48,784.83)
Add: Partial disallowance
of bad debt
[1] 51,683.00 Less: Short period
adjustment
(2,134.00)
Net income of Den-Gar
as redetermined
$ 78,844.18 $ 90,324.03 $ 99,203.29 Net income as reported
(41,387.00)
26,836.00 24,928.00 Alleged understatement
$120,231.18 $ 63,488.03 $ 74,275.29 *347 Respondent also determined that a part of each underpayment was due to fraud on the part of Dennis. OPINION I. Statute of Limitations
A. Dennis and Eliza
(1) Fraud
The period of limitations on the assessment and collection of income taxes is generally 3 years. Sec. 6501(a). In the case of a false or fraudulent return with the intent to evade tax, however, the period of limitations is suspended indefinitely. Sec. 6501(c)(1). The statutory notices of deficiency with respect to Dennis' and Eliza's returns for all of the years in question were issued more than 3 years after the mailing of the respective returns. Respondent argues, however, that the statutory notices were still timely, because each of those returns was fraudulent with the intent to evade tax within the meaning of section 6501(c)(1). [3]
*348 Fraud is an intentional wrongdoing with the specific intent of evading a tax believed to be owed. Powell v. Granquist,252 F.2d 56, 60 (9th Cir. 1958); Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941), revg. and remanding 40 B.T.A. 424 (1939). Whether fraud exists with respect to an underpayment of tax is a question of fact, and the burden is on respondent to prove by clear and convincing evidence that (1) petitioners underpaid their taxes and (2) some part of the underpayment was due to petitioners' intent to commit fraud. Sec. 7454(a); Hebrank v. Commissioner,81 T.C. 640, 642 (1983); Stone v. Commissioner,56 T.C. 213, 220 (1971); Rule 142(b). Respondent must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion *349 of this Court. The required intent may be shown by circumstantial evidence and reasonable inferences drawn from the facts. Stone v. Commissioner,supra at 224; Gajewski v. Commissioner,67 T.C. 181, 200 (1976), affd. per unpublished opinion 578 F.2d 1383 (8th Cir. 1978). We hold that respondent has failed to carry his burden of proving fraud by clear and convincing evidence. With regard to the alleged underpayments themselves, we are mindful of the remarks of the Supreme Court in Holland v. United States,348 U.S. 121, 129 (1954), concerning the difficulties inherent in the reconstruction of income by the net worth method: While we cannot say that these pitfalls inherent in the net worth method foreclose its use, they do require the exercise of great care and restraint. The complexity of the problem is such that it cannot be met merely by the application of general rules. * * * Trial courts should approach these cases in the full realization that the taxpayer may be ensnared in a system which, though difficult for the prosecution to utilize, is equally hard for the defendant to refute. [Citations omitted. *350 ] We believe that this admonition is equally applicable to the reconstruction of income by the method used by respondent in this case--a combination of bank deposits, currency expenditures, and second and third-party check expenditures. Petitioners contend that respondent has failed to show that there was any understatement of their income. They argue that the persuasiveness of respondent's computation is undercut by several errors in its application and by his failure to take into account nontaxable sources of income, such as loan repayments and payments of principal on installment sales. Petitioners also allege that respondent erred in counting as income certain deposits of checks received from petitioners' customers which had already been taken into income at the time of their receipt. Not all of these arguments are valid, but those that are establish that the understatements of Den-Gar's income were less than the amounts determined by respondent. A discussion of the separate errors alleged by petitioners follows: (a) Failure to Adjust for Accounts Payable. Petitioners contend that: The most outrageous of respondent's errors in his application of the bank deposit *351 method was not correcting for the fact that Den-Gar reported El Llano's income on a hybrid accrual method of accounting rather than the cash method. Den-Gar used what its accountant called the hybrid accrual method of accounting. Hybrid accrual meant that merchandise purchases of El Llano were on the accrual method of accounting while all other expenditures and sales were on the cash method of accounting. Petitioners argue that this alleged error has caused the purchases included in total expenditures in the above table to be overstated. Respondent's figures for purchases were taken from Den-Gar's own tax returns and records, and petitioners do not contend that the purchases were not actually made. They argue, however, that, while respondent has assumed that all purchases were paid for by check or cash, some of them were actually made on credit and, consequently, should not be included in expenditures in respondent's computation. Petitioners state that: To determine petitioners' taxable income for each year, the expenditures for purchases should be reduced by the increase in accounts payable in each year. This must be done to eliminate purchases which respondent's computation *352 erroneously assumed were made either by check or by cash (or by cash equivalents such as second and third party checks), but were really made by credit. An examination of the partnership balance sheets included in Schedules L of Den-Gar's partnership tax returns for the years in question reveals, however, that Den-Gar showed balances of zero in accounts payable at the beginning and end of each of those years. We recognize that these balance sheets do not figure directly in the taxable income computed in the returns, and, consequently, that Dennis and his accountant may not have used great care in preparing them, but petitioners have not given us any reason why we should not accept them at face value. Therefore, respondent's computation is unaffected, even assuming that petitioners are correct in their assertion, which respondent contests, that Den-Gar used the accrual method to account for purchases. [4]
*353 (b) Louis Herrera Loans. Petitioners argue that respondent erred in failing to adjust his computation for nonincome receipts in the form of loan repayments on a pre-1971 note in the amounts of $6,750 in 1971, $6,300 in 1972, and $6,875 in 1973. These partial repayments of a $38,500 loan made in 1968 are supported by Herrera's testimony and a promissory note on which the repayments were endorsed. Respondent denies the truthfulness of the testimony and the authenticity of the note, but we think the evidence supports petitioner's contention that these were nontaxable receipts. (c) Julian Ortega Payments. Julian Ortega testified that he and his wife bought two second-hand automobiles from Dennis and paid him for the cars from their earnings in installments at the rate of $300 per month during 1971, 1972, and 1973. Petitioners argue that they realized no gain on the sales of the cars and that these payments represented a nontaxable source of funds. Respondent challenges Ortega's truthfulness, but there is nothing inherently incredible in his testimony. The record contains no real evidence to the contrary. Determining credibility is difficult because Ortega's testimony *354 was taken with the assistance of an interpreter, but on balance we have concluded that his testimony should be accepted. We find that petitioners received $3,000 of nontaxable receipts from Ortega during each of the years 1971 through 1973. (d) Tom Romero's Loan. Tom Romero's widow, Bennie Romero, testified at the criminal trial that her husband died in December 1973. After his death, she found in Romero's wallet a receipt signed by Dennis Garcia in which he acknowledged that he had borrowed $3,000 from Tom Romero on November 11, 1973, for a period of one year, with interest to be paid at the rate of 6 percent per annum. At the criminal trial, cross-examination did not weaken her testimony. Other documents in evidence show that, during this period, Tom Romero had money to loan because he loaned money also to New Mexico Loan Company. On balance, we accept Mrs. Romero's testimony and find that Romero loaned petitioners $3,000 in 1973. (e) Juan Pena's Tax Refund Checks. In 1973, Den-Gar cashed five tax refund checks that Juan Pena had endorsed in the respective amounts of $1,779.70, $4,829.92, $3,039.71, $4,784.36, and $2,246.37, totaling $16,680.06. Pena testified at *355 the criminal trial that he endorsed the first two of these checks totaling $6,609.62 to Den-Gar because Dennis had paid the refunded taxes; in other words, he used the checks to repay a loan. He had no explanation for the other three checks. After the criminal trial, Pena died. His testimony at the criminal trial was inconsistent with the following prior statement to the special agent with respect to the first two checks: The purpose of the check could have been to (a) apply on account, (b) obtain currency in order to pay other bills including my personal car which I owed at that time. I also owed quite a substantial amount of money for three of my sons which were in college (2) and in high school. We are not satisifed that Pena was candid. However, if he merely cashed the tax refund checks to obtain currency or used them to repay a loan from Dennis, the amounts of the checks when deposited would not be taxable income in Dennis' hands. The only other ground for including the checks in Den-Gar's income suggested by the record is that they were applied on Pena's account. It is quite unlikely that Pena had an unpaid charge account of $16,680.06 with a country grocery and *356 general merchandise store. While the evidence on this item is not wholly satisfactory, we do not think that fraud can be inferred from Den-Gar's failure to report the checks as income or that they can properly be treated as part of Den-Gar's gross income. (f) Loans to Estevan Vasquez. Petitioners maintain that the determined bank deposits should be reduced by two loans repaid during the tax years by Estevan Vasquez in a total amount of $6,000. On brief, petitioner concedes that one of the notes was paid off by forfeiting some cattle. The bank deposits may not, therefore, a be adjusted for the repayment in that form. The other purported note is dated April 23, 1971, is in the amount of $3,600, and recites that it is "to be paid in twevle [sic] installments of two hundred fifty Dollars, each, payable weekly after date until the whole amount * * * shall have been paid in full." Respondent points out several inconsistencies with respect to this note. Twelve installments of $250 each amount to only $3,000, not $3,600. If the "loan" evidenced by this note was made from unreported taxable income (and there is no evidence as to whether it was), its only effect would be to shift *357 income among the 3 years. To the purported note, we observe also, is attached a schedule of repayments which shows $350 repayments on "1-10-71, 2-9-71, 3-9-71 and 3-13-71," all of which repayments would have been prior to the April 23, 1971, date of the note. The repayments schedule also shows a $200 repayment on a stated balance of $2,150 followed by a remaining balance of $2,950, an "error" of $1,000. Petitioner's reply brief speculates that the repayment schedule covered both Vasquez notes, but there is no credible evidence to support that explanation. Respondent contends that this April 23, 1971, note, which was not mentioned to the special agent in his interview with Vasquez, is a fabrication. We agree that the note provides no ground for an adjustment of respondent's income determination. (g) United Grocers Account. Beginning in 1956, Dennis repeatedly made loans to United Grocers, one of El Llano store's suppliers. Den-Gar continued to make loans to United Grocers after its formation in 1971. The funds were usually transferred to United Grocers in the form of cashier's checks or third-party checks received by Den-Gar in the course of its business. The loans were *358 generally repaid within a week to 2 months of when they were made, either by second or third-party checks, by United Grocer's own check, or by allowing Den-Gar an offset in the price of merchandise purchased from United Grocers. No notes were given to support the loans. Instead, when United Grocers received money, it would write a check to Dennis or Den-Gar and when the loan was repaid the check was destroyed. In reconstructing petitioners' income, respondent included the loans to United Grocers in the form of second and third-party checks in expenditures presumed to have their source in taxable income. Repayments of the loans were then allowed as an offset against the taxable income so determined. The amounts are as follows: 1971
1972
1973
Loans to United Grocers
$ 10,000.00 $14,200.00 Repayments
(799)
(11,921.31)
(14,723.68)
Net effect on determination
of understated income
$ (799)
$ (1,921.31)
$ (523.68)
Petitioners argue that the actual repayments were "far in excess" of the amounts determined by respondent. One difficulty is that the special agent who investigated the case went through United Grocers' journals and made *359 copies of only selected pages which he thought related to Den-Gar or petitioner. At the criminal trial, the district Judge instructed the jury that they were not to infer that the exhibit headed "Loans from Dennis Garcia to United Grocers, Inc., Loan Payments from United Grocers, Inc., to Dennis Garcia" reflected "all of the loans from Dennis Garcia to United Grocers or that these are all of the loan payments from United Grocers to Dennis Garcia in connection with these loans." After the criminal trial, United Grocers destroyed its journals for those early years because it no longer needed them. The record in this Court thus suffers from the same general infirmities as it did in the district court. On consideration of the record as it stands before us, we find no convincing evidence that loan repayments exceeded the amounts allowed by respondent, which themselves exceeded the amounts of the loans determined to have their source in taxable income. Accordingly, we find that respondent's determination is not erroneous in this respect. (h) Loans to New Mexico Loan Company. The evidence shows that beginning in 1968, Louis J. Herrera, a nephew of Dennis, was the major owner and *360 manager of New Mexico Loan Company.To obtain needed capital, New Mexico Loan borrowed money between 1968 and 1973 from Dennis or Den-Gar. In respondent's reconstruction of sums loaned to New Mexico Loan, the following amounts of loans were deemed to have had their source in taxable income: 1971
1972
1973
Currency loans
$22,625.36
$ 5,963.87
$13,206.70
Loans by second or
third-party checks
31,374.33
73,953.99
45,987.81
Total
$53,999.69
$79,917.86
$59,194.51
To help protect itself from loss on third-party checks which were turned in any Dennis and which were returned unpaid for lack of sufficient funds to cover them, New Mexico Loan identified them on deposit slips with the designation "D-1." Petitioners contend that respondent's computations for the 3 years included all "D-1" checks on Den-Gar's deposit slips and that, in fact, New Mexico Loan cashed third-party checks for Den-Gar and used the "D-1" designation to identify them as well. [5] The result, according to petitioner, is that respondent's loan computations are excessive. *361 This major item has been in dispute from the outset of the investigation of this case. The workpapers of New Mexico Loan's independent accounting firm indicate that Dennis' or Den-Gar's loans to New Mexico Loan approximated respondent's determinations. The currency deposits plus the "D-1" items, notwithstanding Herrera's testimony, quoted in footnote 5, supra, equal or approximate the amount of the loans from Dennis or Den-Gar to New Mexico Loan through December 31, 1973, as determined by respondent. Accordingly, we find that respondent's computation was not erroneous in this respect. We add that the trial record in this case is extremely difficult to evaluate for purposes of determining whether Den-Gar's return was fraudulent. The record includes lengthy, complex schedules and other exhibits prepared and used in petitioner's criminal trial and introduced at the trial of this case with a minimum of explanation and without significant elucitation on brief. In some instances, petitioner emphasizes, no substantial effort appears to have been made to cure the inadequacies that led to the dismissal of petitioner's indictment in the district court. As a result, the parties are *362 wide apart in their positions on the meaning of some of the evidence and the inferences to be drawn from it. The Court's task is further complicated by the accepted fact that customers, in effect, used El Llano store, New Mexico Loan Company, United Grocers, and other business establishments operating in the area as kinds of banks for cashing checks and passing on third-party checks for currency or to pay obligations. The nearest bank was 34 miles away from the El Llano store. The testimony shows that, because of the absence of adequate banking facilities for many years, this use of third-party checks was a common practice in the remote community of northern New Mexico where the El Llano store was located. Use of third-party checks and large amounts of currency in business transactions is usually regarded as a suspicious circumstance in a tax fraud case because such use offers obvious opportunities for income understatements. In the circumstances of this case, however, we do not think any inference unfavorable to petitioners can properly be drawn from this common local business practice. Respondent bases his fraud argument to a large extent on what he characterizes as a lack *363 of candor on the part of Dennis in dealing with his own accountant and which the Internal Revenue Agents who conducted the investigation. We do not think, however, that respondent has shown that Dennis consciously withheld information from Youngberg, his accountant. While Youngberg's efforts to confirm the information supplied to him by petitioner were not as extensive as an audit, he did make inquiries of third parties, apparently with Dennis' knowledge and approval. The record contains no indication that Dennis attempted in any way to hinder Youngberg in his efforts to confirm from outside sources the information that petitioner gave him. To the extent that the information supplied to Youngberg was incomplete, we think the more reasonable inference is that there was to that extent a breakdown in communications between a professional accountant and a taxpayer untrained in bookkeeping and engaged in a great variety of business and investment activities. Nor are we satisfied that respondent has shown that Dennis was uncooperative or attempted to mislead the investigating agents. Our review of the interview summaries and other information in the record indicates a reasonable effort *364 to supply requested information. We think an intent to mislead or conceal can hardly be inferred from the claimed inability to list or a stated reluctance to attempt to identify, every loan or other transaction in which Den-Gar may have engaged over a 3-year period. The wide variety of operations in which Den-Gar was engaged practically preclude perfect and complete recall. From the record before us, it does not appear that petitioner sought to hamper in any way the examination of third-party records on Den-Gar's transactions. While some of the testimony offered at the trial may be suspect, there is no evidence that petitioner was responsible for any witness' lack of candor. Bearing in mind the heavy burden on respondent in his attempts to prove fraud, as well as the uncertainties inherent in any reconstruction of income by the indirect method here used, we conclude that respondent has failed to demonstrate by clear and convincing evidence that petitioner's returns for 1971, 1972, and 1973 were fraudulent. Although we have concluded that the evidence fails to show error with respect to some of the items challenged by petitioners, we do not think that the evidence with respect *365 to any of those controverted items shows fraudulent intent. The limitations bar is not, therefore, lifted by section 6501(c)(1). (2) Substantial Omission of Items
The generally applicable 3-year period of limitations is extended to 6 years by section 6501(e)(1)(A) when there has been a "substantial omission of items." A substantial omission is defined as an omission from gross income of "an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return." Sec. 6501(e)(1)(A). In the case of a trade or business, "gross income" means gross receipts, prior to diminution by cost-of-goods sold. Sec. 6501(e)(1)(A)(i). The statutory notice of deficiency with respect to Dennis' and Eliza's taxable year 1973 was issued more than 3 years but less than 6 years after their return for that year was filed. Therefore, that year remains open for assessment if the 6-year statute applies due to a substantial omission. The statutory notice with respect to 1971 and 1972 was issued more than 6 years after the respective returns were filed, and *366 those years are barred absent fraud. Petitioners argue that the 3-year statute of limitations applies to their cases and, accordingly, that none of the statutory notices of deficiency was timely issued. The burden is on respondent to establish by a preponderance of the evidence that the 6-year statute is applicable. Armes v. Commissioner,448 F.2d 972, 974 (5th Cir. 1971), affg. in part of revg. and remanding in part a Memorandum Opinion of this Court; Williamson v. Commissioner,27 T.C. 647, 659 (1957). Respondent's position that there was a substantial omission of items with respect to 1973 is apparently based on two separate but related arguments: (a) Den-Gar was not a valid partnership for tax purposes, and Dennis and Eliza should have included all of its income in their personal returns, not merely the 25 percent allocated to Dennis by the partnership agreement; and (b) Den-Gar's total income was understated in any case, causing petitioners' share to be understated even if Den-Gar is held to be a valid partnership for tax purposes. We will address *367 these arguments separately. (a) Validity of the Partnership. Dennis contends that Den-Gar is entitled to recognition as a partnership, that he is taxable on only 25 percent of its net income plus his compensation for services, and that the children are taxable on their respective shares of the remainder. Respondent argues that the partnership was a sham and that Dennis is taxable on its entire net income. The controlling statutory provision is section 704(e)(1) which is, in pertinent part, as follows: (e) Family Partnerships.-- (1) Recognition of interest created by purchase or gift.--A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person. (2) Distributive share of donee includible in gross income.--In the case of any partnership interest created by gift, the distributive share of the donee under the partnership agreement shall be includible in his gross income, except to the extent that such share is determined without allowance of reasonable compensation for services *368 rendered to the partnership by the donor, and except to the extent that the portion of such share attributable to donated capital is proportionately greater than the share of the donor attributable to the donor's capital. * * * Paragraph (1) of this subsection lays down two basic requirements. First, the partnership must be one in which capital is an income-producing factor. Second, the person whose status is challenged must "own" a capital interest in the partnership. The tax policies underlying these requirements are: (1) Income from property is taxable to the person who owns the property, and (2) income from services is taxable to the person who renders the services. H. Rept. No. 586, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 357, 380; S. Rept. No. 781, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 458, 485. Kuney v. Frank,308 F.2d 719, 721 (9th Cir. 1962); United States v. Ramos,393 F.2d 618, 624 (9th Cir. 1968). Den-Gar's income was derived, as shown by our findings, from rents, interest, dividends, farming, and profits *369 from the operation of the El Llano store which required capital for inventories. The initial contribution to Den-Gar by each of the children, according to the limited partnership agreement and the subsequently filed partnership returns, exceeded $100,000. The total amount of capital in the business was approximately $1 million. Clearly, therefore, capital was a "material income-producing factor" in Den-Gar's operations within the meaning of section 704(e)(1), and respondent does not contend otherwise. [6]
In order for the Garcia children to come within the scope of section 704(e), it must also be established that they were the true owners of the capital interests attributed to them. The regulations ( sec. 1.704-1(e)(1)(iii), Income Tax Regs.) provide as follows: (iii) Requirement of complete transfer to donee. A donee or purchaser of a capital interest in a partnership is not recognized as a partner under the *370 principles of section 704(e)(1) unless such interest is acquired in a bona fide transaction, not a mere sham for tax avoidance or evasion purposes, and the donee or purchaser is the real owner of such interest. To be recognized, a transfer must vest dominion and control of the partnership interest in the transferee. The existence of such dominion and control in the donee is to be determined from all the facts and circumstances. A transfer is not recognized if the transferor retains such incidents of ownership that the transferee has not acquired full and complete ownership of the partnership interest. Transactions between members of a family will be closely scrutinized, and the circumstances, not only at the time of the purported transfer but also during the periods preceding and following it, will be taken into consideration in determining the bona fides or lack of bona fides of the purported gift or sale. * * * In the case of a donee of a partnership interest, [7] it is required, at a minimum, that the gift be legally effective. Woodbury v. Commissioner,49 T.C. 180, 191 (1967). *371 Respondent does not contest the effectiveness of the transfers to the children under State property law, but argues that other factors require that they be held ineffective for Federal income tax purposes. He argues that the control retained by Dennis over the properties transferred to the children require that he be viewed as the owner for tax purposes. We find, however, that petitioners have made an adequate showing of ownership in the children. The committee reports which accompanied the enactment of section 704(e)(1) state that-- Not every restriction upon the complete and unfettered control by the donee of the property donated will be indicative of sham in the transaction. Contractual restrictions *372 may be of the character incident to the normal relationships among partners. Substantial powers may be retained by the transferor as a managing partner or in any other fiduciary capacity which, when considered in the light of all the circumstances, will not indicate any lack of true ownership in the transferee. In weighing the effect of a retention of any power upon the bona fides of a purported gift or sale, a power exercisable for the benefit of others must be distinguished from a power vested in the transferor for his own benefit. H. Rept. No. 586, 82d Cong., 1st Sess., 1951-2 C.B. at 381; S. Rept. No. 781, 82d Cong., 1st Sess., 1951-2 C.B. at 486. We believe that the management of Den-Gar's property by the general partner, Dennis, was consistent with normal practice in limited partnerships and does not require a finding that the children were not the true owners of their limited partnership interests. Compare sec. 1.704-1(e)(2)(ii)(d), Income Tax Regs.
The regulations provide that the question whether a donee of a partnership interest has actual dominion and control over the interest "must be ascertained from all the facts and circumstances *373 of the particular case." The reality of the transfer is to be ascertained "from the conduct of the parties with respect to the alleged gift and not by any mechanical or formal test." Sec. 1.704-1(e)(2)(i), Income Tax Regs. With specific regard to interests held by minor children, the regulations provide as follows: (viii) Interests (not held in trust) of minor children. Except where a minor child is shown to be competent to manage his own property and participate in the partnership activities in accordance with his interest in the property, a minor child generally will not be recognized as a member of a partnership unless control of the property is exercised by another person as fiduciary for the sole benefit of the child, and unless there is such judicial supervision of the conduct of the fiduciary as is required by law. The use of the child's property or income for support for which a parent is legally responsible will be considered a use for the parent's benefit. "Judicial supervision of the conduct of the fiduciary" includes filing of such accountings and reports as are required by law of the fiduciary who participates in the affairs of the partnership *374 on behalf of the minor. A minor child will be considered as competent to manage his own property if he actually has sufficient maturity and experience to be treated by disinterested persons as competent to enter business dealings and otherwise to conduct his affairs on a basis of equality with adult persons, notwithstanding legal disabilities of the minor under State law. Sec. 1.704-1(e)(2)(viii), Income Tax Regs. The record does not demonstrate that the Garcia children were competent to manage their own property during their minority, but the regulation is satisfied, nevertheless, because control of the property was conferred upon Eliza, and that control was to be exercised for the sole benefit of the children, in accordance with New Mexico's Uniform Gifts to Minors Act. It is true that Eliza submitted no accountings or reports on her stewardship of the childrens' interests, but respondent does not argue that any were required under New Mexico law, [8] and it is only such accounting and reports "as are required by law" that are called for by the regulation. *375 Some of the funds distributed to Dennis were used to support the children. Because the capital accounts were adjusted to reflect the disproportionate distributions, however, that practice did not constitute the "use of a child's property or income for support for which a parent is legally responsible," within the meaning of the regulation quoted above. The childrens' shares of the partnership were not diminished by the distributions; Dennis provided the support out of his own share. One reservation with regard to this holding is caused by Eliza's inexperience and lack of business acumen, which would have left her poorly equipped to defend the childrens' interests if Dennis' actions had required her to do so. But the record does not indicate, and respondent has not suggested, that the assets which the children contributed to the partnership would have been more productively employed in another business, or that the use of the assets by Den-Gar was in any way contrary to the childrens' interests. Nor does it appear that the fact that Dennis received almost all of the partnership's actual distributions harmed the childrens' interests. The distributions were reflected in adjustments *376 to the partners' capital accounts; therefore, the childrens' ownership of Den-Gar's capital was not diminished by the distributions to Dennis. It appears, in short, that although a more qualified guardian of the childrens' financial interests than Eliza might have been chosen, those interests were nevertheless respected in the actual operation of Den-Gar. The actual operation of the partnership is more significant than the question of Eliza's ability to deal with problems which might have arisen, but did not. With regard to donees of interests in limited partnerships such as Den-Gar, the regulations provide as follows: (ix) Donees as limited partners. The recognition of a donee's interest in a limited partnership will depend, as in the case of other donated interests, on whether the transfer of property is real and on whether the donee has acquired dominion and control over the interest purportedly transferred to him. To be recognized for Federal income tax purposes, a limited partnership must be organized and conducted in accordance with the requirements of the applicable State limited-partnership law. The absence of services and participation in management by a donee in a *377 limited partnership is immaterial if the limited partnership meets all the other requirements prescribed in this paragraph. If the limited partner's right to transfer or liquidate his interest is subject to substantial restrictions (for example, where the interest of the limited partner is not assignable in a real sense or where such interest may be required to be left in the business for a long term of years), or if the general partner retains any other control which substantially limits any of the rights which would ordinarily be exercisable by unrelated limited partners in normal business relationships, such restrictions on the right to transfer or liquidate, or retention of other control, will be considered strong evidence as to the lack of reality of ownership by the donee. Sec. 1.704-1(e)(2)(ix), Income Tax Regs. Respondent has not argued that Den-Gar was not "organized and conducted" in accordance with New Mexico limited partnership law. Furthermore, the regulation recognizes that the "services and participation in management" of limited partners are typically very slight, and de-emphasizes the role of these factors in determining whether *378 a valid limited partnership has been created. Accordingly, we think it has little significance that Eliza and the children did not participate in the management of the partnership. The regulation also indicates that substantial restrictions on "the limited partner's right to transfer or liquidate his interest" will be considered strong evidence as to the lack of reality of ownership by the donee. As set forth in our Findings of Fact, the partnership agreement provided that no partner had the right to sell his interest to one not a partner without first offering the interest to the partnership on the same terms and conditions. This restriction, however, applied to Dennis as well as to the children and does not, in our view, require a finding that the children were any less the owners of their interests than Dennis was of his. The partnership agreement provided that the limited partners were unable to "demand or receive any money or property from the partnership" prior to termination, but this is merely consistent with Dennis' sole discretion in the management of the partnership property and with the need of a small family business to insure that it would have sufficient working *379 capital. We do not think that this restriction meant that the childrens' interests were "required to be left in the business for a long term of years" within the meaning of the quoted regulation, because the partnership agreement gave them the right to sell their interests, subject only to the partnership's right of first regusal. Respondent cites and relies mainly upon two decided cases, Ketter v. Commissioner,70 T.C. 637 (1978), affd. without published opinion 605 F.2d 1209 (8th Cir. 1979), and Kuney v. Frank,308 F.2d 719 (9th Cir. 1962). Both of these cases are distinguishable. In Kuney v. Frank,supra, father and son were engaged in the construction business as partners. Each set up trusts, naming the other as trustee for the benefit of other family members. Each trust agreement assigned to the trustee a $100,000 interest out of the grantor's interest in the partnership. The record clearly demonstrated, however, that the partnership assets continued to be managed by the father and son for their own benefit rather than that of the other family members. For example, the father caused partnership assets *380 to be transferred to a newly formed corporation, with all of the stock being issued to him and his son, thereby depriving the trust beneficiaries of their interests in partnership property. In addition, the father and son allowed the corporation to use some of the remaining partnership assets rent-free and ued partnership assets for the credit of the corporation in its borrowing. In essence, the partnership agreement was technically sufficient but the taxpayers ignored the rights and obligations that it purportedly created. In the instant case, in contrast, the Garcias were not sophisticated business people, but their actions and the business records that they kept were basically consistent with the rights created by the partnership agreement. In Ketter v. Commissioner,supra, a certified public accountant operating as a sole proprietor formed trusts for his children, to which he transferred work in progress from his accounting practice and the employment contracts of his employees. The trusts then formed a partnership to provide accounting services for accountants. The grantor/taxpayer was not a partner, but the partnership nevertheless operated under his *381 supervision and never performed services for any accountant but him. Because the partnership's sole source of business was the taxpayer's accounting practice, he exercised control of the flow of income to the partnership. Ketter is distinguishable from the present case. The Court found that capital was not a material income-producing factor in the Ketter partnership. 70 T.C. at 647. The case was, therefore, not controlled by section 704(e), and is distinguishable from the present case on that ground alone. In addition, the employment contracts transferred to the partnership in Ketter were valuable only insofar as the employees had work to do, a factor which remained in the taxpayer's sole control.The fact that the value of the partnership interests held by the trusts was so ephemeral was a factor in the Court's holding that the trusts were not the true owners of those interests. 70 T.C. at 649. In the present case, by contrast, the property transferred to Den-Gar consisted of capital assets valuable in themselves. We hold, in summation, that capital was a material income-producing factor in Den-Gar, and that the children were the true *382 owners of the capital interests ascribed to them in the partnership agreement. Accordingly, the children will be recognized as partners for tax purposes. [9]Sec. 704(e)(1). As a result, the failure by Dennis and Eliza to include the children's 75 percent of Den-Gar's income in their 1973 return did not cause an understatement of their income. *383 (b) Understatement of Partnership Income. Respondent contends that there was a greater than 25-percent omission from Dennis' and Eliza's income in their return for 1973 for the additional reason that the income of Den-Gar shown in its return and, consequently, the income of Den-Gar reported by them was understated. This contention is based on a reconstruction of Den-Gar's income under the method described above in our discussion of the fraud issue. In computing the alleged understatements of income set forth in our findings, respondent began by totaling the deposits to petitioners' and Den-Gar's various checking and savings accounts. To this total, respondent added expenditures made with cash or second and third-party checks, which respondent determined were not already reflected in the bank deposits. The resulting figure was determined by respondent to represent Den-Gar's gross receipts. From this figure, respondent subtracted amounts determined to represent nonincome items, such as loan repayments. Respondent then subtracted operating expenses and the expenses of cost-of-goods sold to arrive at Den-Gar's net income. The computations for 1973 set forth in more detail in *384 our Findings of Fact may be summarized as follows: Bank deposits: Checking
$120,574.94 Savings
14,750.65 Cash expenditures
65,380.58 Second and third-party check expenditures
82,334.21 Gross receipts
$283,040.38 Nonincome items and deposits
(71,311.10)
Cost-of-goods sold
(61,607.16)
Operating expenses
(48,784.83)
Short period adjustment
(2,134.00)
Net income
$ 99,203.29 Dennis and Eliza disclosed the following amount of income for 1973: Form 1065, Den-Gar, for the
short period 1/1/73--9/30/73: Gross receipts
$ 47,668
Interest
28,518
Gross rents
24,428
Total
$100,614
Petitioner's share per return
and partnership agreement [1]
.25
$ 25,154
Form 1040, Dennis & Eliza Garcia,
Calendar 1973: Interest income
$ 25
Total income disclosed by petitioners
in Den-Gar's return and
their personal return
$ 25,179
On the basis of the findings and above discussion, *385 the amount of undisclosed income for 1973 is computed as follows: Understatement of partnership
income per statutory notice [1]
$61,869 Adjustments due to above findings: Herrera loan repayments
(6,875)
Basis recovery on sale of cars to Ortega
(3,000)
Loan proceeds from Romero
(3,000)
Juan Pena's checks
(16,680)
Understatment of partnership
income as adjusted
$32,314 Dennis' share per
partnership agreement
.25 Income omitted by petitioners
$ 8,079 Because the amount of income omitted from Dennis' and Eliza's return, $8,079, exceeds *386 25 percent of $25,179, the amount of income include in their return, the 6-year period of limitations applies and 1973 remains open for assessment. B. The Children
Respondent's primary position in this case was that the Den-Gar partnership was a sham, and that all of its income should have been taxed to the parents and none of it to the children.Had respondent prevailed against Dennis and Elia on his primary position, the cases against the children would have been dropped. Because we have decided above that the partnership must be recognized for tax purposes, we must consider respondent's alternative position that, assuming the partnership is valid, the childrens' distributive share of its income was understated. The statutory notices of deficiency with respect to each of the children's taxable years 1971 and 1973 was mailed more than 3 years but less than 6 years after the tax return for each of the respective years was filed.No deficiency was determined against the children for 1972. Respondent has not alleged fraud with respect to the children; therefore, the years in question remain open only if the 6-year period of limitations of section 6501(e)(1)(A) applies. *387 As stated above in our discussion of Dennis' and Eliza's taxable year 1973, Den-Gar's reported gross receipts for the period ended September 30, 1973, were $100,614. Each of the children is deemed to have reported 12.5 percent of that amount, or $12,577. In addition, they reported small amounts of other income, the highest such amount being $27 of interest income reported by Patricia. Therefore, the reported gross income of each of the children was under $13,000. In our discussion of Dennis' and Eliza's taxable year 1973, we stated our finding that Den-Gar's receipts for the period ended September 30, 1973, were understated by $32,314. Accordingly, the gross income of each of the children was understated by 12.5 percent of that amount, or $4,039. This is more than 25 percent of the reported income of each of the children, which, as indicated above, in no case exceeded $13,000.Therefore, the 6-year period of limitations applied to 1973, and the statutory notices issued to the children with respect to that year were timely. For 1971, the gross income reported by Den-Gar was as follows: Gross sales
$ 69,537
Dividends
226
Interest
20,854
Gross rents
30,626
Total
$121,243
*388 Each of the children is deemed to have reported his 12.5 percent of this total, or $15,155, for purposes of section 6501(e)(1)(A). In addition, each of the children reported $105 of dividend income from other sources. The total gross income reported by each child was, therefore, $15,260. Reconstructing Den-Gar's income by the bank deposits method, respondent determined that its gross receipts for the same period were understated by $68,548.We have found that Den-Gar's receipts for 1971 were understated by $58,798. [10] The gross income of each child was, therefore, understated by 12.5 percent of that amount, or $7,350. This understatement of $7,350 is greater than 25 percent of the $15,260 reported in the returns. Therefore, the 6-year statute of limitations applies, and the statutory notices issued to the children for 1971 were timely. II. The Deficiencies
*389 Respondent's deficiency determinations for the years in question, as discussed above, are based in part on his contentions that the Den-Gar partnership should not be recognized for tax purposes. In our discussion of the statute of limitations, we have held that Den-Gar was a valid partnership, and that holding is also applicable to the question of the deficiencies for the open years. Therefore, the only question remaining with regard to the deficiencies is the validity of respondent's additional contention that Den-Gar's income was understated. Respondent determined that Den-Gar's gross receipts and taxable income were understated by $61,869 for the period ended September 30, 1973, and by $68,548 for the taxable year 1971. In resolving the question whether petitioners omitted a substantial amount of income for those years, we held that respondent had proven that Den-Gar's income had been understated by $58,798 for 1971 and $32,314 for 1973. We make the same findings for the purposes of computing the deficiencies. As set forth in our Findings of Fact, respondent's revision of Den-Gar's reported taxable income for 1971 was based not only on his reconstruction by the bank *390 deposits method, but also on the disallowance of a specific item, a claimed bad debt deduction of $51,683. Respondent later conceded that the amount of the disallowance should have been only $45,670. Petitioners have introduced no evidence with respect to this item, and we hold for respondent on this issue. III. The Additions to Tax
A. Fraud
Respondent determined that Dennis and Eliza underpaid their taxes for each of the years 1971 through 1973, and that part of each underpayment was due to fraud within the meaning of section 6653(b). In resolving the question whether those years were barred by the statute of limitations, we held that respondent had failed to prove fraud by clear and convincing evidence, and that holding is also applicable here. We hold for petitioners with respect to this issue. B. Late Filing
Respondent determined that each of the children was liable for an addition to tax under section 6651(a) for his taxable year 1971. The addition to tax under this section applies when the taxpayer has failed to file his return on time, unless the failure is due to reasonable cause and not due to willful neglect. This issue has been resolved *391 by the parties' stipulation that the childrens' returns for 1971 were timely. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Patricia M. Garcia, a minor, by her next friend, her father, Dennis Garcia, dkt. No. 11697-78; Michael J. Garcia, a minor, by his next friend, his father, Dennis Garcia, dkt. No. 11698-78; Carla Y. Garcia, dkt. Nos. 11699-78 and 12188-80; Dennis R. Garcia, dkt. Nos. 11700-78 and 12046-80; Imelda E. Garcia, dkt. Nos. 11701-78 and 12189-80; Dennis Garcia and Eliza L. Garcia, dkt. No. 11815-80; Michael J. Garcia, dkt. No. 12187-80; Patricia M. Garcia, dkt. No. 12190-80; and Joseph A. Garcia, dkt. No. 12407-80.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted. All Rules references are to the Tax Court Rules of Practice and Procedure unless otherwise noted.↩
1. The accounts for 1971 reflect proportionate shares of the partnership loss reported for 1971.↩
1. Respondent conceded at trial that this bad debt disallowance should have been $45,670 rather than $51,683.↩
3. In connection with the fraud here alleged, petitioner was indicted on June 6, 1979, for various tax crimes concerning his and his wife's returns, their children's returns, and Den-Gar's returns for 1972 and 1973. The criminal trial began on Oct. 1, 1979, and was terminated on Oct. 10, 1979, when the court granted petitioner's motion for acquittal.↩
4. Petitioners argue that, in reconstructing their income, respondent was lax in searching for nontaxable sources of cash. We recognize that Holland v. United States,348 U.S. 121, 135-136 (1954), teaches that the Government has an obligation in a reconstruction of income to make a reasonable investigation of leads furnished by the taxpayer that, if true, would establish the taxpayer's innocence and if such "leads" are reasonably susceptible of being checked. We think the record here shows that, with respect to this item as well as others in dispute, respondent made a reasonable effort to check the taxpayer's explanations. Cf. Estate of Mazzoni v. Commissioner,451 F.2d 197, 200↩ (3d Cir. 1971), affg. a Memorandum Opinion of this Court.
5. Louis J. Herrera testified: Q. Mr. Herrera, now you've described that the D-1 system was used to identify checks that had come from Dennis Garcia; correct? A. That's correct. * * * Q. Isn't it true that from time to time you cashed checks from Dennis Garcia? A. Yes, we did. Q. And isn't it true that you noted them with D-1's as well? A. We did. * * * Q. So then you're telling us that the total of the D-1 items is then necessarily greater than the loans from Dennis Garcia; is that true? A. Right. Q. Do you know how much greater? A. No, I don't Q. Is there any way you could tell us? A. No, I can't.↩
6. Respondent also apparently concedes that the $500 per month allotted to Dennis under the partnership agreement for his management services constituted "reasonable compensation" for those services within the meaning of sec. 704(e)(2)↩.
7. Technically speaking, the children did not acquire their interests in Den-Gar by gifts, but by contributions of their own property. That property, however, had been given to them shortly before Den-Gar was formed with a view to their contribution of the property to the partnership soon thereafter. There is no practical difference between this series of events and direct gifts of partnership interests to the children. Sec. 1.704-1(e)(3)(ii)(a↩), Ex. 1, Income Tax Regs.
8. The custodian must give an accounting if one is petitioned for by the minor, if he has reached the age of 14, or by his legal representative, or by an adult member of his family. N.M. Stat. Ann. sec. 46-7-8↩ (1978). Apparently no such accounting was ever requested of Eliza.
9. Compare Krause v. Commissioner,57 T.C. 890 (1972), affd. 497 F.2d 1109 (6th Cir. 1974).The taxpayers in that case, husband and wife, formed a limited partnership, with limited partnership interests held by trustees established for the benefit of their children and grandchildren. The partnership agreement forbade the third-party trustees from disposing of the trusts' interests in the partnership without the consent of the taxpayers. The taxpayers also had the right to remove the trustees. Because the trustees had the power to return the principal to the respective grantors, the taxpayers' power to replace them amounted to a power to reacquire the partnership interests originally contributed to the trusts. As the Court commented, the taxpayers retained (57 T.C. at 898)-- overwhelming power and authority * * *. In short, they retained a present income interest and reserved the right to reacquire the principal interest. thus, Krause↩ is clearly distinguishable from the present case, in which Dennis and Eliza retained no power to reacquire the property given to their children.
1. In determining the applicability of the 6-year period of limitations provided for in sec. 6501(e), a partner's gross income includes his distributive share of partnership gross income. Sec. 1.702-1(c)(2), Income Tax Regs.↩
1. The partnership's return for 1973 was filed for the short taxable year Jan. 1, 1973 through Sept. 30, 1973, and the $61,869 entered above represents the understatement determined for that period. Because respondent disregarded the partnership entirely, in computing Dennis' and Eliza's income for 1973, he ascribed to them the income of the partnership for the period Oct. 1, 1973 through Dec. 31, 1973, as well. As discussed above, however, the partnership was valid, and it is only the income of the short period ending in petitioners' taxable year 1973 with which we are concerned here. Sec. 706(a).↩
10. This amount is computed as follows: ↩
Understatement of partnership income per statutory
notice
$68,548 Adjustments due to above findings: Herrera loan repayments
(6,750)
Basis recovery on sale of car to Ortega
(3,000)
Understatement of partnership income as adjusted
$58,798