RUBEN CRUZ AND OLGA CRUZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cruz v. Commissioner
Docket No. 15081-89.
United States Tax Court
T.C. Memo 1990-594; 1990 Tax Ct. Memo LEXIS 667; 60 T.C.M. (CCH) 1280; T.C.M. (RIA) 90594; November 20, 1990, Filed *667 Decision will be entered under Rule 155. Robert E. Glanville, for the petitioners. William R. Leighton, for the respondent. FEATHERSTON, Judge. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes:
[1]Additions to Tax, I.R.C. Sections Year
Deficiency
6653(b)
6653(b)(1)
6661
1981
$ 7,067 $ 3,310
--- --- 1982
9,026
--- $ 4,380
$ 2,190
1983
11,149
--- 5,575
2,787
Respondent also determined, for 1982 and 1983, that petitioners are liable for additions to tax under section 6653(b)(2), in amounts equal to 50 percent of the interest due on the part of the underpayment attributable to fraud. The issues for decision are as follows: 1. Whether the assessment of deficiencies for 1981, 1982, and 1983 is barred by limitations. The answer depends on: a. Whether, for these years, petitioners filed false or fraudulent income tax returns with the intent to evade tax within the meaning of section 6501(c)(1); *668 and, alternatively, b. Whether petitioners' returns for 1982 and 1983 omitted from gross income amounts properly includable therein which were in excess of 25 percent of the amounts of gross income stated in the returns.
2. Whether any part of the underpayment of tax for each of 1981, 1982, and 1983 was due to fraud within the meaning of section 6653(b). 3. If the assessment of the determined deficiencies is not barred by limitations, whether such deficiencies are erroneous in amount. 4. Whether petitioners are liable for section 6661 additions to tax for 1982 and 1983. FINDINGS OF FACT At the time the petition was filed, petitioners, Ruben Cruz and Olga Cruz, were legal residents of El Paso, Texas. They timely filed joint income tax returns for 1981, 1982, and 1983 with the Director, Internal Revenue Service Center, Austin, Texas. For convenience, we shall refer to Ruben Cruz as petitioner and Olga Cruz as Mrs. Cruz. Petitioner was born in Zacatecas, Mexico, on December 15, 1935. After completing the third grade in Zacatecas, petitioner left school and worked on his father's ranch before coming to the United States in 1955. He initially lived with and worked for his uncle *669 in El Paso, later holding various jobs in Sacramento, California. After spending less than three years in California, petitioner moved back to El Paso and bought a house for $ 7,000, making a down payment of $ 300 and agreeing to make monthly payments of $ 59. He and Mrs. Cruz were married in 1963. They have four children.
At the time of petitioners' marriage, petitioner was working as a truck driver for Dr. Pepper Bottling Company, earning take-home pay of $ 75 to $ 85 per week. In 1966, he left this job and went to work as a bread truck driver for Kahn's Bakery, where he worked until 1979. Petitioner's take-home pay from Kahn's Bakery averaged about $ 200 per week. Petitioner's father, Ascension Cruz, made gifts of cash, food, and clothing to petitioners from time to time after their marriage. In 1981, Ascention Cruz made a substantial gift to petitioner from the sale of ranch holdings in Mexico. In 1975, while petitioner was still working for Kahn's Bakery, he and Arturo Martinez became equal partners in a newly formed general partnership named A&R Auto Salvage, hereinafter referred to as the partnership. The partnership engaged in the sale of used automobile parts obtained *670 from the dismantling of junk vehicles. From 1975 to April 1979, petitioner worked in the partnership business after his regular work hours for Kahn's Bakery and on Sundays and other days off. From April 1979 through December 1983, petitioner worked full time in the partnership business. During the years at issue, the partnership was petitioners' only source of taxable income.
The partnership, which by 1981 was conducting business from two locations, maintained a bank checking account in which most of its sales proceeds were deposited. During the years at issue, petitioners and the Martinezes (Mr. Martinez and his wife) withdrew cash from the partnership in equal amounts usually approximating $ 300 to $ 500 per week, but occasionally exceeding $ 1,000. These amounts had not been deposited in the partnership bank account prior to withdrawal from the partnership. Petitioners immediately deposited their shares in their personal checking account in another bank. Petitioners' weekly withdrawals totaled $ 21,906 in 1982 and $ 22,410 in 1983. For the years at issue, the partnership income tax returns were prepared by an accounting firm headed by Joe Dominguez. Mr. Dominguez reviewed and *671 signed the completed returns, but they were actually prepared by someone else in his office. The accounting firm had also prepared the partnership returns for 1979 and 1980. For 1979, the completed partnership return necessitated amendments to the partners' already filed individual returns to account for previously unreported partnership income. [2] The accounting firm prepared petitioners' amended 1979 individual return, including therein petitioner's distributive share of income from the partnership. Petitioners' amended 1979 return called for an additional tax payment of over $ 11,000. Each year, Mr. Martinez took to the accounting firm the partnership's bank statements and canceled checks and any available records of cash disbursements. From these records, the accounting firm prepared a trial balance, and from the trial balance prepared the Form 1065 partnership return for each of the three years in controversy. The partnership had no formal books and records other than some sales invoices and what the accounting firm constructed based on the information provided *672 by Mr. Martinez. The accounting firm also prepared annual and quarterly reports for the partnership relating to Federal withheld taxes and State unemployment taxes. The accounting firm calculated the gross receipts shown on the partnership returns by beginning with the total deposits to the partnership bank account for the year, then adding undeposited cash used to make wage payments, and then making minor downward adjustments that the accounting workpapers indicate were generally attributable to dealings with State officials. Both Mr. Dominguez and the accountant who actually prepared the partnership returns believed that the partnership had no gross receipts other than the bank deposits and the cash used to make wage payments. The accounting firm determined partnership expenses other than wages by reviewing and classifying the canceled checks. Checks that appeared to be unrelated to the partnership business, such as checks with "Arturo Martinez" as payee and certain insurance checks, were treated as partner draws rather than partnership expenses.
Petitioner was not involved at all in the preparation of the partnership tax returns. The docket sheets of the accounting firm indicate *673 that the firm did not interview petitioner about the partnership returns at any time during 1981, 1982, or 1983. Mr. Martinez handled most of the business affairs for the partnership, and he furnished the accounting firm with all the records used to prepare the returns. Mr. Dominquez did not meet petitioner until 1983 or 1984, and even then did not discuss petitioners' taxes or the partnership returns. Petitioner signed the 1983 partnership return, but no one at the accounting firm explained its contents. The following table summarizes the partnership returns for the years at issue: 1981
1982
1983
Gross receipts
$ 223,118
$ 160,248
$ 210,537
Less: Cost of goods sold
182,865
114,019
155,432
Gross profit
40,253
46,229
55,105
Less: Total deductions
31,275
30,513
32,769
Ordinary income
8,978
15,716
22,336
Petitioner's income share
4,489
7,858
11,168
Beginning inventory
0
30,560
27,355
Ending inventory
30,560
27,355
17,325
Depreciation deduction
75
0
0 In preparing the 1981 partnership return, the accounting firm made a mistake with respect to the beginning inventory. The partnership, in fact, had on hand at the beginning of the year inventory in an amount approximating the inventory on hand at the end of the year. Also, *674 in 1981 the partnership paid by a cashier's check $ 28,467.11 to the State of Texas to settle a claim for delinquent State sales taxes. No deduction was claimed on the partnership return for this sales tax payment. Based on the information in the partnership returns, the accounting firm prepared petitioners' joint individual income tax returns for 1981, 1982, and 1983. All three returns show as income only petitioner's distributive share of the partnership income shown on the partnership returns. [3] The accountant who prepared the individual returns never interviewed petitioners. Petitioners have never prepared their own income tax returns, do not know how to do so, and because of their limited knowledge of the English language cannot fully understand the words on their individual returns or the partnership returns. Petitioners relied upon the accounting firm to prepare the required returns. During 1982, petitioner *675 paid $ 9,000 in cash to a contractor for the installation of a swimming pool at his home. Also in 1982, he paid $ 900 to $ 1,000 to a different contractor, partly in cash and partly by check, to do the electrical work for the swimming pool. In 1983, petitioner paid $ 20,000 in cash as part payment for the construction of a new home. The first contact petitioners had with the Internal Revenue Service was when two special agents conducting a criminal investigation met briefly with petitioner, and later the same day with both petitioners, on April 15, 1985. At this later meeting, the special agents informed petitioner of his constitutional rights and asked a series of questions from a pre-printed English language form. The agents translated the English questions into Spanish in asking them, and then translated petitioners' Spanish responses into English written notes of the interview. During the interview, petitioners told the agents that they and the Martinezes were taking cash from the partnership each week. They also told the agents that they did not have any substantial amount of cash on hand during the years in issue. On September 11, 1985, petitioners were again interviewed *676 by two special agents, one of whom, Jose Oliva, had also been present at the April interview. During this September interview, petitioner told the agents that the source of a $ 16,200 cashier's check, $ 11,200 of which petitioners deposited in their personal savings account in July of 1981, was a gift from petitioner's father. Petitioners were cooperative with the special agents and furnished all information and documents requested. A revenue agent did not participate in the case until the special agents had concluded their interviews with petitioners. At no point did the special agents or revenue agent conduct a formal audit of the partnership returns under Internal Revenue Service guidelines. Petitioners were indicted for attempted income tax evasion under section 7201 and were brought to trial. At the beginning of the second day of the trial, the Government moved to dismiss the indictment. The motion was granted on July 19, 1988. On March 31, 1989, respondent mailed to petitioners the notice of deficiency alluded to above. The notice of deficiency explains respondent's method of income reconstruction as follows: In the absence of adequate records, your gross receipts for the *677 1981, 1982 and 1983 tax years are computed by reference to bank deposits and cash payments, plus personal and other nondeductible expenditures. See Exhibit A for the computation. Accordingly your taxable income is increased $ 25,695.00, $ 31,134.00 and $ 40,607.00 for the 1981, 1982 and 1983 tax years, respectively.
Exhibit A to the notice contains a computation of respondent's taxable income adjustment for each of the three years before the Court. In computing the deficiencies, respondent for each of the three years included in petitioners' income one-half of the deposits to the partnership bank account and all deposits to petitioners' personal checking and savings accounts, including a 1981 Mexican bank deposit of $ 58,770. Also included were one-half of the cash expenditures (wage payments) of the partnership and one personal cash expenditure for each year. [4] From these totals respondent subtracted non-income funds, including partner draws reported in the partnership returns, withdrawals from savings, transfers between bank accounts, gifts and inheritances ($ 12,650 in 1981), and a 1981 "cash hoard" in the amount of the $ 58,770 Mexican bank deposit. From the remainder, respondent *678 subtracted one-half of the business expenses reported on the partnership returns and the personal exemptions for petitioners and their dependents. Under this formula, respondent arrived at his adjustments to taxable income for the three years in dispute. ULTIMATE FINDINGS OF FACT 1. Respondent has not proved by clear and convincing evidence that any of petitioners' income tax returns for 1981, 1982, or 1983 was fraudulent within the meaning of section 6501(c)(1). 2. Respondent has shown that petitioners omitted from their 1982 and 1983 returns gross income in amounts in excess of 25 percent of the amounts of gross income stated in the returns. 3. Respondent has not proved by clear and convincing evidence that petitioners' return for either 1982 or 1983 was fraudulent within the meaning of section 6653(b). 4. Petitioners have not shown that the deficiency determinations for 1982 and 1983 are erroneous. 5. Petitioners have not shown that respondent abused his discretion in not relieving petitioners of the section *679 6661 additions to tax for 1982 and 1983. OPINION With respect to a preliminary matter, petitioners Ruben Cruz and Olga Cruz were indicated for attempted income tax evasion under section 7201 for the years here in controversy and were brought to trial. On the second day of that trial, the Government moved to dismiss the indictment and the District Court granted the motion. Throughout the trial of the instant case, petitioners' counsel repeatedly sought to elicit testimony from Government witnesses on the reasons for the dismissal motion. The Court ruled that such testimony was not relevant or material in the instant case because the District Court's dismissal order was based on the District Court record. The instant case is to be decided on the record made in this Court. Even if petitioners had been acquitted in the criminal case, the acquittal would not have estopped respondent from determining fraud under section 6501(c)(1) or section 6653(b) in this case. Helvering v. Mitchell, 303 U.S. 391 (1938); Lydon v. Commissioner, 351 F.2d 539, 545 (7th Cir. 1965), affg. a Memorandum Opinion of this Court. The notice of deficiency was mailed on March 31, 1989, long after the expiration *680 of the 3-year statute of limitations on assessments imposed by section 6501(a). The parties agree that petitioners did not waive the section 6501(a) limitations period. Respondent contends, however, that the bar of the statute of limitations on assessments for all three years is lifted by section 6501(c)(1), which provides that in the case of a "false or fraudulent return with the intent to evade tax," the tax may be assessed at any time. Respondent maintains, alternatively, that for 1982 and 1983 the limitations period is extended by section 6501(e)(1), which provides that if a taxpayer omits from gross income a properly includable amount in excess of 25 percent of the gross income stated in the return, the tax may be assessed at any time within 6 years after the return was filed. The notice of deficiency recites that petitioners' gross receipts for the three years in controversy were "computed by reference to bank deposits and cash payments, plus personal and other nondeductible expenditures." The notice thus appears to treat the partnership as a sole proprietorship. In computing the deficiencies, respondent indirectly reconstructed petitioners' income with reference to one-half *681 of the deposits to the partnership bank account and all deposits to petitioners' personal checking and savings accounts. Respondent also included one-half of the partnership's cash expenditures for wages and allowed deductions therefor. The notice of deficiency makes no reference to the provisions of subchapter K of the Internal Revenue Code on the taxation of partnership income. Respondent's case is built largely on admissions made to the special agents in interviews with petitioners. Respondent contends that all of the deposits to petitioners' personal bank accounts not traceable to nontaxable sources, as well as one-half of the deposits to the partnership bank account, were derived from the partnership. Respondent's brief states: The general theory of the case is that the petitioners and the Martinezes, 50/50 partners in A&R, skimmed gross receipts from A&R on a weekly basis to conceal the correct amount of gross receipts reported at the partnership level. The evidence was clear that A&R's accountants used the business checking account to prepare the partnership tax returns, and that receipts not deposited into the checking account were not included in gross receipts on the *682 return. The evidence was also clear that the petitioners and the Martinezes skimmed identical amounts of the cash receipts, and that the petitioners had a steady pattern of weekly cash deposits to their personal checking account.
It will be observed that respondent here refers to gross receipts, not taxable income. Compare sec. 702(a). Also, in presenting this argument, respondent does not mention bank deposits other than the equal weekly withdrawals by petitioners and the Martinezes, nor does he mention the cash expenditures which the notice of deficiency determines to be income. From the initial interview with the special agents who investigated the criminal case through this trial, petitioners have freely admitted that they deposited weekly sums from the partnership into their personal bank accounts and that they regarded these amounts as a salary or wages from the partnership. [5] They contend that their personal cash expenditures and the deposits over and above the weekly amounts were derived from nontaxable sources, mainly a cash hoard of moneys they had accumulated primarily through gifts from petitioner's father and savings from prior employment. They also contend that respondent *683 has failed to show that any of the deposits or cash expenditures were distributive shares of the partnership's income within the meaning of the applicable subchapter K provisions on the taxation of partnership income. Section 6501(c)(1) Fraud
As to the fraud issue, respondent has the burden of proving under section 6501(c)(1) by clear and convincing evidence that petitioners' income tax returns were false or fraudulent with the intent to evade tax. Sec. 7454(a); Rule 142(b); see Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).By fraud is meant the specific intent to evade taxes believed to be owing, carried out by conduct designed to conceal, mislead, or otherwise prevent the collection of such taxes. Spies v. United States, 317 U.S. 492, 499 (1943); Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. This means that respondent has the burden of showing that at least some portion *684 of the disputed personal bank deposits and cash expenditures, whether described as skims, withdrawals, or distributions from the partnership, were petitioner's "distributive share" of the partnership taxable income for each of the years in controversy and that petitioners each knowingly, with intent to evade tax, failed to report such amounts as income. As we view the evidence, respondent has not shown that any one of petitioners' returns for 1981, 1982, or 1983 was fraudulent with the intent to evade tax within the meaning of section 6501(c)(1). Thus, the bar of the statute of limitations is not lifted by that section. Absent fraud, the statute of limitations on assessments for 1981 had expired when the notice of deficiency was mailed and the statute bars any assessment for that year. Respondent relies heavily upon evidence of the bank deposits to carry his burden of proving that petitioners understated their taxable income. As a general rule, once the Government has proved substantial bank deposits by a taxpayer in excess of reported income, has given the taxpayer credit for properly claimed and otherwise allowable deductions, and has taken reasonable steps to eliminate non-income *685 items, the burden is on the taxpayer to explain the remaining excess. United States v. Slutsky, 487 F.2d 832, 840 (2d Cir. 1973).In this case, respondent has shown bank deposits to petitioners' personal accounts, but the parties agree that such deposits (at least to the extent of up to $ 500 per week) were withdrawals from the partnership. In our view, to establish the requisite fraud, respondent must show that the withdrawals are taxable under the applicable subchapter K provisions on the taxation of partnership income. Had the withdrawals been made from a sole proprietorship, respondent might well have been justified in pointing to the bank deposits derived from business activity. A partner's taxable income from a partnership, however, is measured not by distributions or withdrawals but by reference to the partner's "distributive share," i.e., proportionate share, of certain items requiring separate computations and of the partnership's "taxable income" or loss exclusive of such items. Sec. 702(a); sec. 1.702-1(a), Income Tax Regs.; United States v. Basye, 410 U.S. 441, 454 (1973).By "taxable income" is meant gross income minus deductions. Sec. 63(a). Partnership withdrawals *686 or distributions are generally not taxable to a partner. Sec. 731(a)(1). Rather, distributions other than in liquidation of a partner's interest reduce, but not below zero, the adjusted basis of the partner's interest in the partnership. Sec. 733. The regulations provide that "Where money is distributed by a partnership to a partner, no gain shall be recognized to the partner except to the extent that the amount of money distributed exceeds the adjusted basis of the partner's interest in the partnership immediately before the distribution." Sec. 1.731-1(a)(1)(i), Income Tax Regs.; see Falkoff v. Commissioner, 62 T.C. 200, 207 (1974).
At trial, Special Agent Oliva was asked specifically whether he made any effort to determine petitioner's basis for his partnership interest and he replied that he did not. At another point the agent testified, "My investigation was with Mr. and Mrs. Cruz's personal tax return[s] for '81, '82, and '83, and not for the [Form] 1065 partnership [returns]." Respondent offered no evidence to show petitioner's basis for his partnership interest. Nor did respondent make any effort at the trial to prove the partnership's taxable income as such for any of the *687 three years in controversy. Thus, respondent has not shown that petitioner's distributive share of the partnership taxable income as such exceeded the reported amounts. Speculation or suspicion that a partner's distributive share of partnership taxable income was understated will not support a fraud determination. See Terrell v. Commissioner, T.C. Memo. 1987-520. Respondent attempts, however, to reconstruct the notice of deficiency. He points out that petitioners and the Martinezes each week withdrew equal amounts of gross receipts from the partnership which were never deposited in the partnership bank account. Because these sums were not deposited, they were not included in the ordinary income reported on the partnership return. Had they been deposited, the partnership's gross receipts would have been greater and, the argument goes, petitioner's distributive share of the partnership income would have been proportionately larger than the amount shown on the return. Disregarding questions as to the validity of respondent's methodology, we do not think the partnership gross receipts can be automatically transformed into distributive shares of partnership taxable income. Reconstruction *688 of income by use of the bank deposits method produces at best only an approximation based on circumstantial inferences, and the investigation on which it is based should establish a guarantee of its essential accuracy. United States v. Slutsky, supra at 840; see Holland v. United States, 348 U.S. 121 (1954).The parties stipulated that respondent did not formally audit the partnership returns. As pointed out above, Special Agent Oliva testified that his investigation "was with" the individual returns and not the partnership returns. He admitted that he made no effort to verify the correctness of several items essential to the determination of the partnership's taxable income, such as the cost of goods sold, inventory, taxes paid, and depreciation deductions to which the partnership was entitled. Neither the determinations in the notice of deficiency nor the evidence presented at trial purport to show the operating results, i.e., the "taxable income," of the partnership during the years in issue. The evidence shows a gross error with respect to the cost of goods sold. The partnership return for 1981 shows an opening inventory of zero and a closing inventory of $ 30,560. A low *689 opening inventory and a high closing inventory have the effect of increasing income. Mr. Dominguez, who had visited both places of business of the partnership, testified that the opening inventory was approximately the same as the closing inventory for that year and that his firm simply made a mistake in the preparation of the return. Respondent does not deny that the partnership had inventory on hand at the beginning of 1981, but argues that the partnership had no basis in the inventory at that time because the 1980 partnership return showed a closing inentory of zero. On this ground respondent argues that the 1981 opening inventory had a basis of zero and was, therefore, correctly reported. The trial record does not suggest that the partnership changed its method of accounting for inventory. See sec. 481. Nor does respondent challenge the truthfulness of the testimony that the accounting firm simply made a mistake. In these circumstances -- it is established by the great weight of authority that, if a taxpayer has not misrepresented or suppressed the facts, the statute of limitations not only prevents any reassessment of the tax after the prescribed period has passed; but that *690 the Treasury may not assess a tax for a later year to make up for a credit erroneously allowed, or a charge erroneously omitted, in an earlier year. * * * [Commissioner v. Dwyer, 203 F.2d 522, 524-525 (2d Cir. 1953), affg. a Memorandum Opinion of this Court.]
See Korn Industries, Inc. v. United States, 209 Ct. Cl. 559, 532 F.2d 1352, 1356 (1976); Las Cruces Oil Co. v. Commissioner, 62 T.C. 764, 770 (1974). The record also shows that the partnership settled a sales tax dispute with the State of Texas and in 1981 paid a deficiency of $ 28,467.11. Because the deficiency was paid with a cashier's check rather than a check drawn on the partnership bank account, the 1981 partnership return shows no deduction for the tax payment. Respondent now concedes that the partnership is entitled to the deduction, but asserts that the funds used to acquire the cashier's check were additional unreported partnership gross receipts. The record contains no evidence to support respondent's assertion. The total amount of these two items alone -- the inventory adjustment and the State sales tax payment -- is more than twice the amount of respondent's adjustment to petitioners' taxable income for 1981. In *691 addition, a cursory examination of the partnership returns shows a depreciation deduction of only $ 75 for 1981 and no depreciation deduction whatever for 1982 and 1983. Depreciation is not, of course, an item which would be reflected by the partnership's bank statements. The partnership used two buildings and a warehouse for its operations. Petitioner testified that in the years immediately preceding the years in controversy the partnership bought some trucks and other vehicles for use in the business. Petitioners contend that the depreciation deductions allowable on the buildings and equipment were substantial. Had the partnership returns been audited, a depreciation deduction might have been allowed. In criminal tax fraud situations involving the net worth method of income reconstruction, it has long been established that the Government's case "might fail when the Government does not track down relevant leads furnished by the taxpayer--leads reasonably susceptible of being checked, which, if true, would establish the taxpayer's innocence." Holland v. United States,supra at 135-136.This principle has also been applied to the bank deposits method, e.g., United States v. Slutsky, 487 F.2d 832, 841 (2d Cir. 1973), *692 and extended to civil tax fraud cases. E.g., Fairchild v. United States, 240 F.2d 944, 948 (5th Cir. 1957).When the Government fails to show an investigation into the validity of leads provided by the taxpayer, the trial court may consider them as true for purposes of weighing the sufficiency of the evidence on the fraud issue. Holland v. United States,supra at 136. The record indicates that the agents did not adequately follow up petitioner's lead about a significant nontaxable source of funds. Special Agent Oliva testified that petitioner told him, at their meeting in September 1985, about a 1981 gift of 2 million pesos from his father. The agent's interview memorandum, written the day after the interview, supports his testimony. Respondent now agrees with petitioners that, at applicable 1981 exchange rates, 2 million pesos in value equaled approximately $ 82,000. Nonetheless, respondent credited petitioners with 1981 gifts and inheritances received of only $ 12,650. Although petitioner's father was deceased at the time of trial, uncontroverted testimony established that he was alive for at least a few years beyond 1985. Further, during the September 1985 interview, petitioner *693 provided the agents with the name and address of a sister, living in El Paso, who supposedly had some knowledge of this gift. There is nothing in the record, however, suggesting that the agents checked with petitioner's father or sister about this matter. It appears that, because petitioner told the agents a $ 16,200 cashier's check originated in the 2-million-peso gift, the agents assumed that 2 million pesos equaled just $ 16,200. [6] The $ 65,000 difference from the actual dollar value of 2 million pesos provides a possible source of funds for the swimming pool expenditure in 1982, the new house expenditure in 1983, and the unexplained bank deposits (untraceable deposits over and above the weekly withdrawals) for 1982 and 1983. We emphasize that we do not here find as a fact that the gift from petitioner's father amounted to 2 million pesos. On the fraud issue, however, respondent has the burden of proof and the obligation *694 to check all reasonable leads in order to verify the essential accuracy of the income approximation produced by the bank deposits and cash expenditures method of income reconstruction. Respondent's failure to interview petitioner's father and sister about this matter permits this Court, as we have done, to treat petitioner's assertion as true for purposes of the fraud issue, but such treatment does not constitute a fact finding for other purposes. Apart from establishing establilshing an underpayment for the years at issue, respondent must also prove by clear and convincing evidence that petitioners had the requisite fraudulent intent. Parks v. Commissioner, 94 T.C. 654, 664 (1990).He has failed to do so. Mr. Martinez handled practically all business dealings for the partnership, including dealings with the accounting firm which prepared the partnership returns. The information he supplied to the accounting firm consisted mainly of the partnership bank statements and canceled checks. Petitioner never saw the 1981 and 1982 returns before they were filed. Although petitioner signed the 1983 return, he did not know what was in it. No one at the accounting firm explained it to him *695 and he did not understand the meanings of many of the terms on the return. Petitioner had only the most meager understanding of the taxation of partnership income. See Haring v. United States, 142 F. Supp. 782 (N.D. Ohio 1956).Respondent did not call Mr. Martinez as a witness. He was the one who could have answered questions as to why the cash distributions were not included in partnership income, why the partnership did not claim a deduction for the State sales taxes, and other vital questions. Mrs. Cruz did not work in the business and had nothing whatever to do with the preparation of the partnership returns. We add that throughout the investigation of petitioners' returns, petitioners were fully cooperative with the agents. They never declined to answer any questions or supply any requested information. Petitioner readily agreed to a request that the agents be given access to the bank records for petitioners' accounts. Although the parties quibble about petitioner's candor on some points, we do not think he attempted to mislead the agents. Respondent has not shown that the returns for the three years in controversy were false or fraudulent with the intent to evade tax within *696 the meaning of section 6501(c)(1). Consequently, the bar of the statute of limitations is not lifted by that section. The 6-Year Statute of Limitations
As to respondent's alternative argument that, notwithstanding the fraud issue, the bar of the statute of limitations is lifted for 1982 and 1983, section 6501(e)(1)(A) provides: (A) GENERAL RULE.--If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed * * * at any time within 6 years after the return was filed. For purposes of this subparagraph-- (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services * * * Contrasted with section 6501(c)(1), discussed above, which refers to a false or fraudulent return with the intent to evade "tax," section 6501(e)(1)(A)(i) refers, in the case of a trade or business, to the "total of the amounts received or accrued from the sale of goods or services * * * prior *697 to diminution by the cost of such sales or services." This means that the inquiry is directed to the omission of gross income. Respondent has the burden of proving by a preponderance of the evidence that the 6-year statute of limitations is applicable. Armes v. Commissioner, 448 F.2d 972, 974 (5th Cir. 1971), affg. in part, revg. and remanding in part a Memorandum Opinion of this Court. He must show (1) that petitioners omitted from gross income an amount in excess of 25 percent of the gross income stated in the return, and (2) that the omitted amount was properly includable in gross income. Davenport v. Commissioner, 48 T.C. 921, 927-928 (1967); see Bardwell v. Commissioner, 38 T.C. 84, 92-93 (1962), affd. on another issue 318 F.2d 786 (10th Cir. 1963).Respondent must also establish either the likely source of the omitted income or that there are no applicable nontaxable sources. Armes v. Commissioner, T.C. Memo. 1973-88, on remand from 448 F.2d 972 (5th Cir. 1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974).[7] Further, in determining the total gross income stated in a partner's return under section 6501(e)(1), the partnership return is to be considered together *698 with the partner's return. George Edward Quick Trust v. Commissioner, 54 T.C. 1336, 1346-1347 (1970), affd. per curiam on another issue 444 F.2d 90 (8th Cir. 1971); Davenport v. Commissioner, supra at 928; see Rose v. Commisioner, 24 T.C. 755, 769 (1955). Petitioners argue that respondent has failed to carry his burden on this issue because he failed to show that the bank deposits (and cash expenditures) were petitioner's distributive share of what their brief calls partnership income. Petitioners misread the statutes. Section 702(a) provides that in "determining his income tax, each partner shall take into account separately his distributive share of the partnership's * * * taxable income." With certain exceptions not relevant here, the "taxable income of a partnership shall be computed in the same manner as in the case of an individual." Sec. 703(a). The term "taxable income" generally means gross income minus allowable deductions. Sec. 63(a). If section 6501(e)(1) referred to taxable income there would be merit in petitioners' argument. That section, *699 however, refers to the omission of "gross income," not taxable income. Prior to the adoption of the 1954 Code, some of the courts were in disagreement as to the meaning of gross income as used in the predecessor of section 6501(e)(1) with respect to income from a trade or business. Several courts adopted the view that gross income meant gross receipts. E.g., Goodenow v. Commissioner, 238 F.2d 20, 22 (8th Cir. 1956), revg. 25 T.C. 1 (1955).Other courts, including the Tax Court, read gross income to meant gross profits. E.g., Carew v. Commissioner, 215 F.2d 58, 61-62 (6th Cir. 1954), affg. a Memorandum Opinion of this Court. In adopting the 1954 Code, Congress resolved the disagreement by enacting section 6501(e)(1)(A)(i), quoted above. By providing that gross income, in the case of a trade or business, means the total of the amounts received for the sale of goods or services "prior to diminution by the cost of such sales or services,: the section in effect equates gross income with gross receipts. Petitioners point out that only a partner's distributive share of partnership taxable income goes into gross income on the partner's individual return. Section 702(c) provides, however, *700 that "where it is necessary to determine the gross income of a partner * * *, such amount shall include his distributive share of the gross income of the partnership." Section 1.702-1(c)(1) and (2), Income Tax Regs., explains the application of section 702(c) as follows: (1) Where it is necessary to determine the amount or character of the gross income of a partner, his gross income shall include the partner's distributive share of the gross income of the partnership, that is, the amount of gross income of the partnership from which was derived the partner's distributive share of partnership taxable income or loss * * * (2) In determining the applicability of the 6-year period of limitation on assessment and collection provided in section 6501(e) (relating to omission of more than 25 percent of gross income), a partner's gross income includes his distributive share of partnership gross income (as described in section 6501(e)(1)(A)(i)). In this respect, the amount of partnership gross income from which was derived the partner's distributive share of any item of partnership income, gain, loss, deduction, or credit (as included or disclosed in the partner's return) is considered as an *701 amount of gross income stated in the partner's return for the purposes of section 6501(e). * * *
See Estate of Iverson v. Commissioner, 27 T.C. 786 (1957), affd. 255 F.2d 1 (8th Cir. 1958); Garcia v. Commissioner, T.C. Memo. 1984-340. Under this regulation, the "amount of partnership gross income from which was derived" petitioner's "distributive share" of the partnership reported gross income for 1982 is $ 80,124 (one-half of the reported gross receipts of $ 160,248) and for 1983 is $ 105,269 (one-half of the reported gross receipts of $ 210,537). The 1982 amount of gross income of $ 80,124 "is considered as an amount of gross income stated" in petitioners' return for the purposes of section 6501(e)(1)(A). For 1982, the amount of the weekly withdrawals from the partnership which was not included in partnership gross income was $ 21,906 and the swimming pool cash expenditure was at least $ 9,000, a total in excess of 25 percent of the gross income considered to be stated in petitioners' return for 1982. For 1983, petitioners' share of the weekly withdrawals, $ 22,410, plus cash expenditures of $ 20,000 for the construction of their new home exceeds 25 percent of the gross income *702 considered to be stated on the 1983 return, $ 105,269. We discuss in detail below our reasoning as to the "omitted" status and source of these weekly withdrawals and personal cash expenditures.
Parenthetically, we observe that, in our view, the "lead-check rule" discussed above does not apply under section 6501(e)(1). The rule was laid down in Holland v. United States, 348 U.S. 121, 135-136 (1954), a criminal case in which the defendant's liberty was jeopardized. As discussed above, the rule has been extended to civil fraud cases, in which a determination of fraud carries with it a stigma of dishonesty. In both types of cases, because of the seriousness of the charge, a heavy burden of proof is imposed on the Government. Also, in both types of cases, the Government before determining fraud usually conducts a detailed investigation. In contrast, the taxpayer must plead the bar of the statute of limitations on assessments. Rule 39. If it is not pleaded,it is waived. No issue as to the statute of limitations arises until it is pleaded. In Tunnell v. Commissioner, 74 T.C. 44 (1980), affd. per curiam 663 F.2d 527 (5th Cir. 1981), this Court held that the lead-check rule did not *703 apply with respect to the redetermination of a deficiency in a case where fraud was determined in the notice of deficiency but (because of collateral estoppel) was not at issue at trial. We think the same principle applies under section 6501(e)(1) in this case. Cf. Estate of Gibbs v. Commissioner, 21 T.C. 443, 447 (1954). Because petitioners admit that the partnership is the source of the weekly deposits to their personal bank accounts, respondent has established, a fortiori, a likely source. Respondent has also shown that such amounts are includable in partnership gross income (as gross receipts) and, accordingly, are includable in petitioners' gross income under section 702(c). We must now weigh petitioners' contention that the swimming pool and new home cash expenditures, as well as deposits in excess of the weekly withdrawals, came not from the partnership but from a cash hoard. Petitioners contend that they saved the cash from three sources: employment from 1963 through 1979, draws from the partnership from 1976 through 1978, and gifts from petitioner's father. They assert that the cash hoard, which they allegedly kept in their home, exceeded $ 191,000. Apart from the $ *704 58,770 amount for which petitioners were given credit, we do not find the cash hoard story convincing. Petitioner's wages as a truck driver from 1963 to 1979 were hardly enough to permit any substantial savings. Petitioners' income tax returns for 1976, 1977, and 1978, show no distributive shares of income from the partnership. For many years, petitioners have had both a savings and a checking account at a local bank. We do not think petitioners would forgo interest on $ 191,000 and risk its loss through burglary of their home. At the interviews with the special agents, petitioners were asked if they had any cash on hand at the beginning of the years at issue and they answered that they did not have any substantial amount. It is true that petitioner's father made gifts to petitioners, but the notice of deficiency credits petitioners in 1981 with gifts and inheritances of $ 12,650 and a cash hoard (deposited that same year in a foreign bank account) of $ 58,770. Respondent concluded that these amounts offset what respondent otherwise would have classified as taxable income under his bank deposits analysis. On this record, even though respondent did not check the 2-million-pesos *705 lead, we decline to give petitioners the benefit of a larger cash hoard than did respondent. The trial record does not show conclusively the source of the funds used to make the cash expenditures. In the light of all the evidence, however, we find that the funds had a likely source in gross receipts siphoned from the partnership by petitioner without the knowledge or consent of his partner, Mr. Martinez. Petitioner admitted that he took cash from the partnership during 1978 through 1980 without the knowledge or consent of Mr. Martinez. The availability of the funds needed for the swimming pool and new home projects provides a reasonable inference that the pattern continued in 1982 and 1983. We find as a fact that for 1982 and 1983 the partnership was capable of producing the additional gross receipts described above, both the equal weekly amounts withdrawn by the partners and the cash for petitioners' purchases. See Armes v. Commissioner, 448 F.2d 972, 975 & n.2 (5th Cir. 1971).The partnership business was started in 1975. Petitioner testified to the construction of a building in 1978 and a warehouse in 1980. The partnership bought another piece of real estate in 1979. In addition, *706 petitioner testified to the purchase of thousands of dollars worth of automotive equipment in 1980. The business was thriving and had the potential of producing the additional sums. For the additional partnership gross receipts withdrawn without the knowledge of Mr. Martinez, petitioner's distributive share (if petitioner had not taken the funds) would have been one-half of $ 9,000 for 1982 and one-half of $ 20,000 for 1983. However, for purposes of section 6501(e)(1), petitioners are considered to have omitted gross income of not less than the full $ 9,000 for 1982 and the full $ 20,000 for 1983. Under Texas law relating to general partnerships, a partner has no right to possess specific partnership property, for purposes other than partnership purposes, without the consent of the other partners. Tex. Rev. Civ. Stat. Ann. art. 6132b, sec. 25(2)(a) (Vernon 1970). Moreover, the misappropriation by one partner to his own use of partnership property is considered constructive if not actual fraud on the partnership, and is actionable. Veale v. Rose, 657 S.W. 2d 834, 837 (Tex. Ct. App. 1983); Smith v. Bolin, 261 S.W. 2d 352, 365 (Tex. Civ. App. 1953), affd. in part and revd. in part *707 on other grounds 153 Tex. 486, 271 S.W. 2d 93 (1954).As this Court has stated: any taxpayer who acquires property under circumstances which do not permit the conclusion that the property was received with a consensual recognition, express or implied, of an obligation to repay, and without restriction as to its disposition, is in receipt of taxable income. [Mais v. Commissioner, 51 T.C. 494, 498 (1968).] See James v. United States, 366 U.S. 213, 219 (1961).
Thus, respondent has carried his burden of proof on this issue. We find that petitioners omitted from gross income amounts in excess of 25 percent of the gross income stated in the returns within the meaning of section 6501(e)(1)(A). The bar of the statute of limitations on assessments for 1982 and 1983 is lifted. Section 6653(b) Fraud
Respondent determined that petitioners underpaid their taxes for each of the years 1981, 1982, and 1983, and that part of each underpayment was due to fraud within the meaning of section 6653(b). In resolving whether the statute of limitations bars assessments for those years, we held that respondent had failed to prove fraud by clear and convincing evidence. That holding is also applicable here, *708 and we find that petitioners are not liable for section 6653(b) additions to tax. 1982 and 1983 Deficiency Determinations
Because the assessment of deficiencies for 1982 and 1983 is not barred, petitioners have the burden of showing that respondent's deficiency determinations for 1982 and 1983 are erroneous. Ruidoso Racing Assn., Inc. v. Commissioner, 476 F.2d 502, 507 (10th Cir. 1973), affg. in part and remanding in part a Memorandum Opinion of this Court. Petitioners have this burden even if the method used by respondent in computing the deficiencies is erroneous. Giddio v. Commissioner, 54 T.C. 1530 (1970); Estate of Finder v. Commissioner, 37 T.C. 411, 423 (1961); see Markman v. Commissioner, T.C. Memo. 1987-407.In our view, petitioners have not carried their burden and the deficiency determinations for 1982 and 1983 must be sustained. Petitioners first challenge respondent's failure to allow depeciation deductions for the two years remaining in controversy. Petitioner testified that the partnership made the following expenditures: Year of Purchase
Item
Cost
1978
1972 Chevy flatbed truck
$  4,000
1980
Diesel White Freightliner
14,000
1980
Tractor rig
3,000
1980
Two (1970 and 1971) trucks
5,000
1980
1972 Ford F-800 truck
6,200
1980
1965 Ford tow truck
1,500
1980
Hyster forklift
7,000
1980
Digging of well
1,000
1980
Coke machine
1,200
1975
Fence
3,000
In *709 addition, petitioner testified that in 1978 the partnership constructed a $ 15,000 building and in 1980 constructed another building, a warehouse, for $ 25,000. In 1979, he testified, the partnership bought another piece of property and paid $ 18,000 for the land and $ 60,000 for the building located thereon. Section 167(a) and (g) relating to depreciation provides: (a) GENERAL RULE.--There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)-- (1) of property used in the trade or business * * * * * * (g) BASIS FOR DEPRECIATION.--The basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 1011 for the purpose of determining the gain on the sale or other disposition of such property. Under section 1011, which references section 1012, the beginning point for determining basis is the cost of the property. A taxpayer claiming a depreciation deduction has the burden of proving the basis of the property, the rate of depreciation (or the useful life of the property), and its salvage value. Sec. 1.167(a)-1(a), Income Tax Regs.; *710 Welch v. Helvering, 290 U.S. 111 (1933); Caxton Printers, Ltd. v. Commissioner, 27 B.T.A. 1110, 1115-1116 (1933). Petitioner has not carried that burden. As to the trucks and other equipment, petitioner, in response to a single question, testified to the purchase of all of the above-listed items (except the fence) and the cost of each item. His testimony was not corroborated by any receipts, invoices, or other documentation. There is no testimony as to the uses to which the several items were placed by the partnership, the condition they were in when acquired, or any other information on their useful lives. Nor is there any testimony on the salvage values of the properties. "In the computation of the depreciation allowance, recovery is permitted only of the cost of the asset less its salvage or resale value." Dezendorf v. Commissioner, 312 F.2d 95, 96 (5th Cir. 1963), affg. a Memorandum Opinion of this Court. Taking into account the nature of the partnership business, salvage value would be a particularly important factor in determining the depreciation allowance for trucks, tractor rigs, and other automotive vehicles. Further, there is no testimony on the nature of the buildings *711 and their probable useful lives on which we could base a finding that the partnership is entitled to a depreciation deduction. Here, again, the testimony of Mr. Martinez might have been enlightening to corroborate petitioner's testimony, but petitioners did not call him as a witness. Taking into account the 1981 inventory adjustment, the sales tax deduction, and the depreciation deduction in dispute, petitioners next contend that the partnership had a net operating loss for 1981 which, when carried over to 1982 and 1983, is sufficient to extinguish any liability for 1982 and 1983. Apart from our conclusion that petitioners have not made the requisite showing for a depreciation deduction, petitioners misread the statutes on net operating loss carryovers which reduce otherwise taxable income from the partnership.
First, section 702(a)(7) authorizes the Secretary to prescribe by regulation items of income, gain, loss, deduction, or credit which each partner shall take into account separately. Section 1.702-2, Income Tax Regs., provides: "For the purpose of determining a net operating loss deduction under section 172, a partner shall take into account his distributive share of items of *712 income, gain, loss, deduction, or credit of the partnership." Thus partners, not the partnership, account for net operating loss carryovers. Sec. 703(a)(2)(D). Second, a net operating loss generally must first be carried back to the three immediately preceding years and only the amount not absorbed by the carryback is subject to carryover. Sec. 172(b)(2) and(b)(1)(A); Newton v. Commissioner, 57 T.C. 245, 247-248 (1971).Petitioners have not shown that they elected under section 172(b)(3)(C) to relinquish the carryback period. We have rejected petitioners' cash hoard argument in our discussion of section 6501(e)(1) and it requires no further comment. Petitioners contend, finally, that the accounting firm misclassified certain checks given for insurance and other items in making their computation of partnership income. Petitioner testified in general terms that some checks were misclassified but his general testimony was not supported by any documentation or other corroborating evidence. [8] *713 We do not find petitioner's testimony, standing alone, convincing. Petitioners have not carried their burden of showing respondent's deficiency determinations for 1982 and 1983 are erroneous. Section 6661 Addition to Tax
Section 6661(a), as applicable to the instant case, provides that if there is a substantial understatement of income tax for any taxable year, then 25 percent of the amount attributable to such understatement shall be added to the tax. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). The amount of an understatement is reduced if the taxpayer has substantial authority for the reported tax treatment, or if the taxpayer adequately discloses the relevant facts in the return or in a statement attached to the return. Sec. 6661(b)(2)(B). Petitioners do not argue for a reduction in the understatements on either of these grounds. Petitioners instead argue that there were no understatements for the years at issue and, even if there were, that petitioners acted in good faith. We have concluded above that there were indeed understatements for 1982 and 1983, and we here conclude that these understatements were substantial *714 within the meaning of section 6661(b)(1)(A). We therefore turn to petitioners' alternative contention. The statute provides that the Secretary may waive all or part of this addition to tax on a showing by the taxpayer that there was reasonable cause for the understatement and that the taxpayer acted in good faith. Sec. 6661(c). Petitioners in effect ask the Court to waive the section 6661 addition. That authority, however, rests with the Secretary of the Treasury or his delegate, not with this Court. See sec. 1.6661-6(a), Income Tax Regs. We are only empowered to decide whether there has been an abuse of discretion. Mailman v. Commissioner, 91 T.C. 1079, 1084 (1988). The petition in this case does not allege that respondent rejected a requested waiver, nor does the trial record suggest any such request or response. Petitioners have provided us with no foundation to which we could apply the appropriate standard of judicial review. In any event, given the facts discussed above in connection with the 6-year statute of limitations, we do not think there was an abuse of discretion. Respondent's 1982 and 1983 determinations regarding section 6661 are sustained. To reflect the foregoing, *715 Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954, as amended and in effect for the years at issue. Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Petitioners' 1976, 1977, and 1978 individual returns show no distributive share of income or loss from the partnership. ↩
3. The 1983 return also shows wage income of $ 596, with an accompanying Form W-2 listing "Olga Cruz" as the employee. The record suggests that this is petitioners' daughter, not Mrs. Cruz, and the notice of deficiency decreases petitioners' taxable income by this amount.↩
4. The personal expenditure listed for 1981 is a $ 1,450 down payment on a Jeep vehicle; for 1982, $ 13,862 for a swimming pool; for 1983, $ 20,000 for home construction.↩
5. The partnership wage payments that the accounting firm both included in gross receipts and deducted as business expenses were apparently made to persons other than petitioners or the Martinezes.↩
6. As already noted, respondent's bank deposits reconstruction credited petitioners with 1981 gifts of $ 12,650. The difference from $ 16,200, under respondent's methodology, is cash that was neither deposited nor used for any of the purchases listed in note 4, supra.↩
7. See also Rosberg v. Commissioner [Dec. 46,687(M)], T.C. Memo. 1990-328; Carr v. Commissioner [Dec. 35,462(m)], T.C. Memo. 1978-408↩.
8. In this regard, Mr. Dominguez merely testified as to how his firm originally classified the checks, not as to how they should have been classified.